1

2

3

4

5

6

7

8

### UNITED STATES DISTRICT COURT

9

### EASTERN DISTRICT OF CALIFORNIA

10

11 | LACKISHA LASHE MARIE SHIRLEY,    )    Case No.: 1:17-cv-0807 - JLT

                                    )

12 |           Plaintiff,              )    ORDER DIRECTING ENTRY OF JUDGMENT IN

                                      )    FAVOR OF DEFENDANT, NANCY A.

13 |     v.                           )    BERRYHILL, ACTING COMMISSIONER OF

                                      )    SOCIAL SECURITY, AND AGAINST PLAINTIFF

14 | NANCY A. BERRYHILL,              )    LACKISHA LASHE MARIE SHIRLEY

Acting Commissioner of Social Security,     )

15 |                                          )

16 |           Defendant.             )

                                         )

17

18       Lackisha Lashe Marie Shirley asserts she is entitled to a period of disability, disability insurance

19 benefits, and supplemental security income under Titles II and XVI of the Social Security Act. Plaintiff

20 argues the administrative law judge erred in finding her mental impairments were not severe. Because

21 the ALJ applied the proper legal standards, and the step two findings are supported by substantial

22 evidence in the record, the administrative decision is **AFFIRMED**.

23 ### PROCEDURAL HISTORY

24       Plaintiff filed her applications for benefits on December 7, 2012, alleging disability beginning

25 March 29, 2011. (Doc. 9-3 at 18) The Social Security Administration denied the applications at both

26 the initial level and upon reconsideration. (*See generally* Doc. 9-4; Doc. 9-3 at 18) After requesting a

27 hearing, Plaintiff testified before an ALJ on October 23, 2015. (Doc. 9-3 at 42) The ALJ concluded

28 Plaintiff was not disabled under the Social Security Act, and issued an order denying benefits on March

9, 2016. (*Id.* at 18-32) The Appeals Council denied Plaintiff's request for review on April 17, 2017. (*Id.* at 2-5) Thus, the ALJ's determination became the final decision of the Commissioner of Social Security ("Commissioner").

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). If a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial

gainful employment. *Maounois v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

**ADMINISTRATIVE DETERMINATION**

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920(a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity ("RFC") to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider testimonial and objective medical evidence. 20 C.F.R. §§ 404.1527, 416.927.

**A.      Relevant Medical Evidence**[1]

On March 29, 2011, Plaintiff was employed by PetSmart when a "dog reared behind and bit her in the left leg area." (Doc. 9-9 at 8) Dr. Glenn Fujihara examined plaintiff and found she suffered a "left leg contusion with strain." (*Id.*) In addition, he noted Plaintiff may have a back strain, because she was "limping a lot." (*Id.*)

In May 2011, Plaintiff had a checkup regarding back pain with Rocio Munoz, PA-C, who noted that Plaintiff was "also complaining of possible depression." (Doc. 9-17 at 9) Plaintiff told Mr. Munoz that she was "emotional" for about four weeks, and cried four to five times each week and she was "unsure why." (*Id.*) Later that month, Plaintiff reported "[a]nxiety with fear of dying," and "[r]ecent depression." (*Id.* at 6) Mr. Munoz noted that Plaintiff described "[f]eelings of hopelessness" and "[s]ocial withdrawal." (*Id.*) Plaintiff started taking Paxil and reported she felt "significantly better" after being on the medication for two weeks. (*Id.*) Mr. Munoz referred Plaintiff to a behavioral health provider. (*Id.* at 7, 11)

At a follow-up regarding her medication in August 2011, Plaintiff reported she had been off Paxil for three weeks and was "having trouble sleeping again," "more nightmares, sadness, and suicide thoughts again." (Doc. 9-17 at 3) Plaintiff reported she lost her house about a month before and was

---

[1]The Court has reviewed the entirety of the medical record. However, Plaintiff challenges only the ALJ's evaluation of medical evidence related to her mental impairments. Accordingly, the summary focuses on evidence related to Plaintiff's mental impairments.

living with her sister, who stated that Plaintiff was "more irritable and mean while off Paxil." (*Id.*) Mr. Munoz opined Plaintiff did not "show hostile/aggressive behavior," though she did appear confused. (*Id.* at 3, 4)

Plaintiff initiated a worker's compensation claim and reported in February 2012 that "as a result of the industrial injury, she suffers from depression and sadness." (Doc. 9-10 at 48) Dr. Marshall Lewis observed that Plaintiff became "slightly tearful when she start[ed] to describe what happened to her." (*Id.* at 52) Dr. Lewis diagnosed Plaintiff with cervicalgia, thoracic spine pain, lumbar spine pain, morbid obesity, and depression. (*Id.* at 53) He requested that Plaintiff receive a "[p]sych evaluation with treatment." (*Id.* at 54)

In April 2012, Plaintiff described "progressively worsening depression and anxiety" to Dr. Daniel Reyes, a "Secondary Treating Physician" for Dr. Lewis. (Doc. 9-10 at 63) Dr. Reyes opined Plaintiff appeared "in slight distress" during the examination. (*Id.*) The following month, Plaintiff told Dr. Lewis that her depression was "improving." (*Id.* at 26; Doc. 9-20 at 19)

In August 2012, Rocio Munoz, PA-C, noted that Plaintiff had been diagnosed with adjustment disorder with depressed mood and depressive disorder. (Doc. 9-16 at 46) Plaintiff was prescribed Paxil QD and Konopin for these conditions. (*Id.* at 39)

Dr. Howard Terrell administered a psychiatric evaluation related to the workers' compensation claim on August 22, 2012. (Doc. 9-19 at 8) With regard to "mental health/substance abuse issues," Plaintiff told Dr. Terrell that she was a recovering addict, and she had completed 18 months of drug counseling after being "arrested for cashing forged checks." (*Id.* at 30) Plaintiff reported that her activities including taking 14 units in college, visiting with her aunt, walking with her dog, doing homeworking, and watching television. (*Id.* at 35) Dr. Terrell observed that Plaintiff had good eye contact, and "was friendly and cooperative throughout the interview." (*Id.* at 34) He noted Plaintiff's "[m]ood ranged from euthymic to dysthymic to moderately depressed, especially when talking about her chronic pain and how the work-related injuries have devastated her life." (*Id.* at 35) He opined Plaintiff had good long and short-term memory, and "excellent" recall, because she was "able to recall 5 out of 5 items within 5 minutes." (*Id.* at 34-35) He found Plaintiff had good insight and judgment. (*Id.* at 35) Dr. Terrell diagnosed Plaintiff with "Major Depressive Disorder, single episode, severe,

without psychotic features (partially improved with antidepressant medication);" "Anxiety Disorder NOS;" "Panic Disorder without Agoraphobia;" and amphetamine abuse, reportedly in remission since 2005. (*Id.*) He gave Plaintiff a GAF score of 61.[2] (*Id.* at 36) In identifying Plaintiff's "disability status," Dr. Terrell stated:

> I believe the claimant has been temporarily totally disabled on a psychiatric basis since approximately five to six weeks after her work-related injury when she developed symptoms of major depression, panic attacks and anxiety. I believe that she remains temporarily totally disabled on a psychiatric basis at this time.

(*Id.*) Dr. Terrell opined that Plaintiff was "in need of a higher level of psychiatric treatment," and there was "a high likelihood of additional improvement if she [was] placed under the care of a skilled and experienced psychiatrist." (*Id.* at 37) Therefore, he recommended that Plaintiff "be authorized to receive at least 25 sessions of treatment" and "receive any antidepressant medication that her treating psychiatrist deems necessary and appropriate." (*Id.*)

On September 25, 2012, Plaintiff went to the emergency room, reporting she "felt lightheaded and dizzy," and "then had a brief loss of consciousness" when walking to class. (Doc. 9-11 at 5) She reported she had anxiety "and thought perhaps her symptoms were secondary to anxiety." (*Id.* at 7) Following an examination, Plaintiff was diagnosed with labile sinus tachycardia. (*Id.* at 13) She later had a tilt table test, which showed "presyncope for a short period of time." (*Id.* at 18)

On January 9, 2013, Dr. Lewis noted that he received "a letter from the insurance company stating that the psyche [sic] [treatment] had been denied. (Doc. 9-17 at 43, 44) He noted Plaintiff continued to have depression, and indicated that he would again "request[] a pysch consultation and treatment." (*Id.* at 44)

Dr. Terrell completed a supplemental report on January 16, 2013, drafting a letter to attorneys regarding Plaintiff's workers' compensation claim. (Doc. 9-18 at 29) Dr. Terrell noted Plaintiff's claim for injury to her low back and left leg was accepted, but her psych claim was denied. (*Id.* at 30)

---

[2] The Global Assessment of Functioning scores range from 1-100, and in calculating a GAF score, the doctor considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed.) ("DSM-IV).
A GAF score between 61-70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 34.

He reported that his "diagnoses in this case remain[ed] virtually the same." (*Id.*) Dr. Terrell was asked his opinion on whether Plaintiff was "capable of performing work whether at PetSmart or for another employer, and responded:

> The claimant is suffering not only psychiatric problems, but has also reportedly been suffering physical symptoms due to the industrial injury. It is my understanding that even though she had worked for PetSmart for approximately two to three years, her own employer, PetSmart, was not willing to take her back given her physical limitations.
>
> …
>
> Given her work-related injuries and limitations as well as her work-related emotional injuries, I do not believe the claimant would be successful in the competitive job market until such time that she has received proper psychiatric treatment and experienced a substantial improvement in her emotional problems. Even though it is my understanding that she is attending college, this does not guarantee that she would be successful in the competitive job market, especially given her work-related industrial physical limitations and her work related psychiatric problems.

(Doc. 9-8 at 34, emphasis omitted) Dr. Terrell noted that he was unaware "[w]hether or not [Plaintiff] received the type of psychiatric treatment that [he] recommended," but she had the recommended treatment, "there [was] a high likelihood of her improving on an emotional basis such that she may potentially become capable of returning to work on a part-time or possibly even a full-time basis." (*Id.* at 35, emphasis omitted)

In March 2013, Plaintiff continued to report depression to Dr. Lewis during an examination related to Plaintiff's physical impairments. (Doc. 9-8 at 21)

Dr. Greg Hirokawa, a psychologist, performed a "Comprehensive Psychological Evaluation" in conjunction with Plaintiff's workers' compensation claim on April 16, 2013. (Doc. 9-22 at 51) Plaintiff reported she had an "above average" performance in school, "denied ever being arrested," and denied a personal history of physical or sexual abuse. (*Id.* at 53-54) Dr. Hirokawa noted:

> The patient reported experiencing symptoms of depression and anxiety primarily due to work related problems. She reported having problems feeling emptiness, sad, worthless, less energy, helplessness, and has thoughts of dying. She reported that she avoids going out in public. Her current stress level was reported as high. She denied any symptoms of psychosis or a formal thought disorder.
>
> Cognitively, she reported having problems with her ability to concentrate and changes in … her short and long term memory.

(*Id.* at 52-53) Plaintiff also told Dr. Hirokawa that after her injury she "lost it" and "tried to kill

6

herself," but "her sister came by and took her to the doctor." (*Id.* at 52) She said she had a "good relationship with her family," and good relationships with "a few friends." (*Id.* at 53) Plaintiff "described her relationship with [the PetSmart] supervisor as fair and with co-workers as good." (*Id.* at 54) Plaintiff told Dr. Hirokawa that she had "anxiety around dogs that she does not know," and her other psychological stressors included: "[h]ealth, marital/significant other, job, and loss of residence." (*Id.*) Plaintiff reported that her ability to deal with stress was "okay," and she considered her "friends as resources to cope with stress." (*Id.*)

Dr. Hirokawa observed that Plaintiff had a fair mood and pleasant attitude, and her "behavior was cooperative throughout the evaluation." (Doc. 9-22 at 55) He opined Plaintiff had appropriate thought content; appropriate affect; and normal judgment, insight, stream of mental activity and association of thought. (*Id.*) Dr. Hirokawa determined that Plaintiff did not exhibit any "evidence of delusional thinking," and her sense of reality was intact. (*Id.*) According to Dr. Hirokawa, Plaintiff's "[r]emote memory appeared intact based upon … [her] ability to recall various events throughout [her] life with adequate detail." (*Id.*) In addition, he believed Plaintiff's "[c]oncentration for conversation was adequate." (*Id.*) He concluded Plaintiff had "symptoms of depression and anxiety," consistent with the findings of Dr. Terrell. (*Id.*) Dr. Hirokawa indicated he would "perform the individual therapy" recommended by Dr. Terrell, and requested authorization to refer Plaintiff to a "psychiatrist, who can prescribe[] her psychotropic medications." (*Id.*)

Dr. Dan Funkenstein reviewed Plaintiff's medical records, including the psychiatric evaluation by Dr. Hirokawa, and completed a psychiatric review technique assessment on May 15, 2013. (Doc. 9-4 at 10-12) Dr. Funkenstein noted Plaintiff was diagnosed with depression and anxiety. (*Id.* at 11-12) He opined Plaintiff's record "from [the] worker's comp case and some treatment as an adult [were] consistent with mild limitations." (*Id.* at 11) Dr. Funkenstein determined Plaintiff had mild restrictions of activities of daily living; mild difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace. (*Id.* at 10) He found no repeated episodes of decompensation of an extended duration. (*Id.*) Dr. Funkenstein concluded Plaintiff's mental impairment "[o]verall is simply Not Severe." (*Id.* at 11)

On May 21, 2013, Dr. Hirokawa began treating Plaintiff. (Doc. 9-22 at 50) Plaintiff reported

that she had "animals to help" with her "mood [and] support." (*Id.*) In addition, she informed Dr. Hirokawa that she planned to move to Oregon with her mother. (*Id.*) Dr. Hirokawa observed that Plaintiff had a depressed mood. (*Id.*) He opined Plaintiff's cognition, memory/concentration, and affect were within normal limits. (*Id.*) Dr. Hirokawa diagnosed Plaintiff with Depressive Disorder, Not Otherwise Specified. (*Id.*)

On June 18, 2013, Plaintiff told Dr. Hirokawa that she was going to stay with her mother in Oregon until mid-August, at which time she would continue her appointments. (Doc. 9-23 at 7) She reported that her sleep and appetite were "fair." (*Id.*) Dr. Hirokawa opined that Plaintiff's memory, cognition, motor skills, and affect were within normal limits. (*Id.*) He again indicated Plaintiff was diagnosed with Depressive Disorder, NOS. (*Id.*)

In July 2013, Plaintiff informed Dr. Hirokawa that she had instead moved to San Luis Obispo with her father. (Doc. 9-23 at 6) She described "anxiety related to being bitten by a dog" and being "fearful of similar dogs," which caused her to shake or cry. (*Id.*) In addition, she reported that she avoided PetSmart "due to fear." (*Id.*) Dr. Hirokawa opined Plaintiff's mood and affect were "fair," and believed the reported symptoms were "consistent [with] dog bite injures." (*Id.*) Dr. Hirokawa diagnosed Plaintiff with Anxiety Disorder, Not Otherwise Specified. (*Id.*) The treatment notes no longer indicated a diagnosis of depression. (*See id.*)

In August 2013, Plaintiff "reported continued anxiety around large dogs; except for the three she [was] familiar with." (Doc. 9-23 at 5) Dr. Hirokawa opined this was "consistent" with others who suffered similar injuries. (*Id.*) He also noted Plaintiff had additional stress over her "future living location." (*Id.*) Dr. Hirokawa again determined Plaintiff's mood was fair; and she had a normal affect, memory/concentration, and cognition. (*Id.*)

Later that month, Mr. Munoz noted Plaintiff had been diagnosed with postural orthostatic tachycardia syndrome (POTS), and she "had several episodes of syncope and [was] scared to pass out in public." (Doc. 9-24 at 34) Plaintiff told Dr. Hirokawa that she had "anxiety around others; but [was] improving especially using an electric cart in stores." (Doc. 9-23 at 4) She also continued to have "anxiety around large dogs," and reported "occ[asional] nightmares of being bitten by [a] dog." (Doc. 9-23 at 4) Dr. Hirokawa noted Plaintiff was taking Paxil and Clonazepam (Klonopin) for her

anxiety, "with benefit." (*Id.*) He opined Plaintiff's mood was fair; and she had a normal affect, cognition, and memory/concentration. (*Id.*) He gave Plaintiff a GAF score of 65, and indicated she continued to have Anxiety Disorder, NOS. (*Id.*) Dr. Hirokawa opined that Plaintiff had reached "Maximum Medical Improvement" as of August 20, 2013, and was "likely to have varying levels of anxiety around large animals." (*Id.*) He also concluded Plaintiff was Permanently Partially Disabled for her worker's compensation claim. (*Id.*)

In February 2014, Plaintiff informed Mr. Munoz that her workers' compensation case "was recently settled," and she had "been under a lot of stress." (Doc. 9-27 at 4) She stated that her father had just passed away due to a brain aneurysm, and she wanted to be screened for an aneurysm with an MRI. (*Id.*) Mr. Munoz observed that Plaintiff was alert and not in acute distress. (*Id.*) He offered to increase Plaintiff's prescription for Paxil, which she declined. (*Id.* at 5)

Dr. Tim Schumacher reviewed the record while Plaintiff's request for reconsideration was pending with the Social Security Administration on March 7, 2014. (Doc. 9-4 at 58-59) He noted that Plaintiff reported "worsening of depression and anxiety" on her application for reconsideration. (*Id.*) Dr. Schumacher observed that Plaintiff had "anxiety around animals" after being bitten at work and continued to report "anxiety around dogs" through August 2013. (*Id.*) He found Plaintiff's "mental status findings were normal" at the April 2013 examination with Dr. Hirokawa, and she continued to have "grossly normal" mental status through September 2013. (*Id.*) Dr. Schumacher concluded the medical record did "not support worsening of anxiety and depression." (*Id.*) He adopted the findings of Dr. Funkenstein at the initial level, concluding Plaintiff had mild limitations with activities of daily living; mild difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace. (*Id.* at 58, 59).

In July 2015, Plaintiff told Mr. Munoz that she had recently returned from Oregon. (Doc. 9-27 at 2) Mr. Munoz noted Plaintiff was no longer taking Paxil and Klonpin because she was "smoking marijuana to control her symptoms," which she said "helps." (*Id.*) Mr. Munoz identified "generalized anxiety disorder" and depression as part of Plaintiff's past medical history, and did not identify either impairment with the current assessment. (*Id.*)

///

**B.      Plaintiff's Exertion Questionnaire and Function Report**

In March 2013, Plaintiff completed an "exertion questionnaire" and "function report" for the Social Security Administration.  (Doc. 9-7 at 34-36)  She reported she would go grocery shopping with her uncle, sister, or father, because she needed help with loading her groceries.  (*Id.* at 34)

She stated that she spent her days lying in bed "watching T.V. or reading a book."  (Doc. 9-7 at 59) According to Plaintiff, her hobbies and interests also included "visiting family, going to the movies, [and] Bar-B-Que.  (*Id.* at 62) Plaintiff said she took care of pets, though she did not indicate what she did for them.  (*Id.* at 59)  She reported she could dress if she did so "very quickly" or sat on the bed to do so.  (*Id.*)  Plaintiff said she did not cook food, and instead prepared "T.V. dinners or a sandwich."  (*Id.* at 59-60)

Plaintiff indicated that her conditions affected her ability to complete tasks, concentration, and get along with others.  (Doc. 9-7 at 63)  She did not believe her conditions affected her memory.  (*Id.*)  Plaintiff estimated that she could pay attention for "about 2 hours," explaining that with her medication it was "very hard to concentrate."  (*Id.* at 63-64)  She also stated that she would "stay away from people" because she was "very easily aggetated (sic)."  (*Id.* at 64) When asked how well she handled stress or changes in routine, Plaintiff responded, "I don't."  (*Id.* at 65)

**C.      Administrative Hearing Testimony**

On October 23, 2015, Plaintiff testified at an administrative hearing before an ALJ.  (*See* Doc. 9-3 at 41) She stated that she was no longer able to work due to pain, anxiety, seizures, and passing out.  (*Id.* at 46)  Plaintiff confirmed that she had a prescription for Clonazepam for panic attacks, but stated she did "[n]ot really" find it helpful.  (*Id.* at 47)  Plaintiff said she was not using marijuana for her conditions, and that she had only done so while visiting her mother in Oregon.  (*Id.* at 54-55)

Plaintiff said that she flew to visit her mother in Oregon, and they took a six-hour train ride to Mount Vernon, Washington.  (Doc. 9-3 at 55)  She stated that when traveling, she had a concierge to push her through TSA screening and the airport.  (*Id.* at 56)  When asked if she experienced any difficulties with traveling on the train, Plaintiff said she "was fine," explaining her mother booked "a bed car" where she "could pull the mattress down and… lay down." (*Id.*)

She reported that she lived alone in a motor home on her aunt and uncle's property.  (Doc. 9-3

at 48-49)  Plaintiff said she could prepare her own meals; go grocery shopping; and do some housework, such as cleaning her toilet.  (*Id.*)  She stated that her sister vacuumed for her, and assisted Plaintiff with getting in and out of the bathtub because her balance was not good.  (*Id.*)  Plaintiff testified that her hobbies included decoupage, watching television and movies, and watching her dog play.  (*Id.* at 50-51)

Plaintiff testified she was not receiving any kind of mental health treatment as of the hearing date.  (Doc. 9-3 at 56)

## D.     The ALJ's Findings

Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial gainful activity after the alleged onset date of March 29, 2011.  (Doc. 9-3 at 20)  At step two, the ALJ found Plaintiff's severe impairments included: "postural orthostatic tachycardia syndrome (POTS), degenerative disc disease of the cervical and lumbar spine, and obesity."  (*Id.*) The ALJ noted Plaintiff alleged several mental impairments, including depression, mood disorder, and anxiety disorder. (*Id.* at 21)  The ALJ concluded Plaintiff's "history of mood disorder and anxiety disorder, considered singly and in combination, do not cause more than minimal limitation of the claimant's ability to perform basic mental work activities."  (*Id.*)  In addition, the ALJ found Plaintiff's depression "significantly improved with medication."  (*Id.*) Therefore, the ALJ concluded Plaintiff's "mental impairments are nonsevere."  (*Id.* at 23)

At step three, the ALJ determined Plaintiff did not have an impairment, or combination of impairments, that met or medically equaled a Listing.  (Doc. 9-3 at 24)  Next, the ALJ determined:

> [T]he claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a): she can lift and/or carry 10 pounds occasionally and frequently; she can stand and/or walk for about 2 hours in the course of an 8-hour day, and sit for more than 6 hours on a sustained basis in an 8-hour workday.  Her capacity for pushing and/or pulling hand or foot controls is consistent with the lifting and carrying limitations.  She can occasionally climb ramps and stairs and never climb ladders, ropes, or scaffolds.  She can occasionally balance and stoop, and frequently kneel, crouch, and crawl.  She must avoid even moderate exposure to unprotected heights and hazards.

(*Id.* at 24-25)  With these limitations, the ALJ found "there are jobs that exist in significant numbers in the national economy that the claimant can perform."  (*Id.* at 22)  Thus, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act.  (*Id.* at 23)

11

**DISCUSSION AND ANALYSIS**

Plaintiff argues that the ALJ erred at step two of the sequential evaluation finding that she does not suffer from severe mental impairments. (Doc. 15 at 4-10) According to Plaintiff, the ALJ erred in evaluating the medical record, and the final decision "rest[s] upon error of law." (*Id.* at 10) On the other hand, the Commissioner argues that the ALJ's "decision was based upon substantial evidence and free of reversible error." (Doc. 16 at 11)

**A.      Waiver**

An ALJ is required to make credibility determinations in each decision, to determine whether a claimant's subjective complaints should be credited. *See Brown-Hunter v. Colvin*, 806 F.3d 487, 489 (9th Cir. 2015). The Ninth Circuit explained, "To ensure that our review of the ALJ's credibility determination is meaningful, and that the claimant's testimony is not rejected arbitrarily, we require the ALJ to specify which testimony she finds not credible, and then provide clear and convincing reasons, supported by evidence in the record, to support that credibility determination." *Id.* Here, the ALJ found Plaintiff's "statements concerning the intensity, persistence, and limiting effects of [her] symptoms are not credible." (Doc. 9-3 at 37) Plaintiff does not address the ALJ's findings regarding the credibility of her subjective complaints in her opening brief.

The Ninth Circuit "has repeatedly admonished that [it] cannot 'manufacture arguments for an appellant.'" *Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) (quoting *Greenwood v. Fed. Aviation Admin.*, 28 F.3d 971, 977 (9th Cir. 1994)). Rather, the Court will "review only issues with are argued specifically and distinctly." *Id.* Therefore, when a claim of error is not argued and explained, the argument is waived. *See, id.* at 929-30 (holding that party's argument was waived because the party made only a "bold assertion" of error, with "little if any analysis to assist the court in evaluating its legal challenge"); *see also Hibbs v. Dep't of Human Res.*, 273 F.3d 844, 873 n.34 (9th Cir. 2001) (an assertion of error that was "too undeveloped to be capable of assessment" need not be addressed by the court).

Because Plaintiff does not address the adverse credibility determination in her opening brief, any challenge to the credibility determination has been waived. *See Bray v. Comm'r of Soc. Sec. Admin*, 554 F.3d 1219, 1226 n.7 (9th Cir. 2009) (where a claimant failed to raise an argument in the

opening brief, the Court deemed it waived); *Zango v. Kaspersky Lab, Inc.*, 568 F.3d 1169, 1177 n. 8 (9th Cir.2009) ("arguments not raised by a party in an opening brief are waived").

**B.      Step Two Findings**

The inquiry at step two is a *de minimis* screening for severe impairments "to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) (citing *Bowen v. Yuckert*, 482 U.S. 137, 153-54 (1987)).  The purpose is to identify claimants whose medical impairment makes it unlikely they would be disabled even if age, education, and experience are considered.  *Bowen*, 482 U.S. at 153 (1987).  At step two, a claimant must make a "threshold showing" that (1) she has a medically determinable impairment or combination of impairments and (2) the impairment or combination of impairments is severe. *Id*. at 146-47; see also 20 C.F.R. §§ 404.1520(c), 416.920(c).  Thus, the burden of proof is on the claimant to establish a medically determinable severe impairment. *Id.*; *see also Bray v. Comm'r of Soc. Sec. Admin*, 554 F.3d 1219, 1222 (9th Cir. 2009) ("The burden of proof is on the claimant at steps one through four...").

An impairment, or combination thereof, is "not severe" if the evidence establishes that it has "no more than a minimal effect on an individual's ability to do work."  *Smolen*, 80 F.3d at 1290.  For an impairment to be "severe," it must limit the claimant's ability to do basic work activities, or the "abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1520(c), 416.920(b).  Specifically, basic work activities include "[u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations, and [d]ealing with changes in a routine work setting." 20 C.F.R. §§ 404.1521(b), 416.921(b).

1.      Anxiety diagnosis

As an initial matter, Plaintiff contends that "missing from the ALJ's analysis is that [Plaintiff] alleged both depression and anxiety."  (Doc. 15 at 8)  However, the ALJ specifically noted that Plaintiff had a "history of mood disorder and *anxiety disorder*," and that Dr. Hirokawa noted Plaintiff "reported anxiety around large dogs."  (Doc. 9-3 at 21, 22) (emphasis added)  In addition, the ALJ indicated he considered whether Plaintiff's anxiety, alone or in combination with her other medically determinable mental impairments, caused "more than minimal limitation of … [her] ability to perform basic work mental activities."  (*Id.* at 21)  Thus, contrary to Plaintiff's assertion, the ALJ did not ignore her

13

diagnosis of anxiety in evaluating her mental impairments at step two.

### 2. ALJ's interpretation of the evidence

Plaintiff argues, "The ALJ interpreted the medical evidence on his own, which is improper." (Doc. 15 at 8, citing *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)).

It is well-settled law that an ALJ may not render his own medical opinion and is not empowered to independently assess clinical findings. *See, e.g., Tackett v. Apfel*, 180 F.3d 1094, 1102-1103 (9th Cir. 1999) (holding an ALJ erred in rejecting physicians' opinions and rendering his own medical opinion); *Banks v. Barnhart*, 434 F. Supp. 2d 800, 805 (C.D. Cal. 2006) ("An ALJ cannot arbitrarily substitute his own judgment for competent medical opinion, and he must not succumb to the temptation to play doctor and make his own independent medical findings"); *Nguyen*, 172 F.3d at 35 (1st Cir. 1999) (as a lay person, the ALJ is "simply not qualified to interpret raw medical data in functional terms"). "When an ALJ rejects all medical opinions in favor of his own, a finding that the RFC is supported by substantial evidence is less likely." *See Stairs v. Astrue*, 2011 WL 318330, at *12 (E.D. Cal. Feb.1, 2011). For example, this Court determined an ALJ erred where all medical opinions were rejected before the ALJ formulated the RFC. *See Perez v. Comm'r of Soc. Sec.*, 2018 WL 721399 (E.D. Cal. Feb. 6, 2018).

The ALJ did not reject all medical opinions in evaluating Plaintiff's mental impairments at step two. The ALJ summarized the clinical findings of Drs. Terrell and Hirokawa and indicated that he rejected only the "opinions on issues reserved to the Commissioner," as discussed below. (*See* Doc. 9-3 at 22) The ALJ gave "great weight" to the psychiatric review technique assessments and narrative interpretations of Drs. Schumacher and Funkenstein, and indicated that he "relied on the opinion of the state agency's consulting doctor[s]." (*Id.* at 22-23, citing Exh. 5A p.10 [Dr. Funkenstein] and Exh. 6A, p.10 [Dr. Schumacher]) Consequently, the Court finds that ALJ did not interpret the medical evidence on his own.

### 3. Rejection of conclusions from Drs. Terrell and Hirokawa

In Social Security cases, physicians offer two types of opinions: (1) medical, clinical opinions regarding the nature of a claimant's impairments and (2) opinions on a claimant's ability to perform

work. *See Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (in disability benefits case "physicians may render medical, clinical opinions, or they may render opinions on the ultimate issue of disability—the claimant's ability to perform work"); *see also Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001). Here, Plaintiff argues the ALJ erred in his assessments of opinions offered by Drs. Terrell and Hirokawa. (Doc. 15 at 6-7)

### a. Statement of Dr. Hirokawa

In challenging the ALJ's review of the medical evidence, Plaintiff observes that "Dr. Hirokawa stated:

> The following is based upon an integration of the clinical interview, psychosocial history and mental status exam:

> Ms. Shirley has symptoms of depression and anxiety primarily consistent with Dr. Terrell, psychiatric evaluation, PQME, on August 22, 2012. He recommended 25 sessions of individual therapy with a skilled psychiatrist. I am requesting authorization to refer her to Dr. Rowell, Fresno psychiatrist, who can prescribe her psychotropic medications and follow-up and I will perform the individual therapy."

(Doc. 15 at 6, quoting AR 1054, 1067 [Doc.9-22 at 55; Doc. 9-23 at 13]) Although Plaintiff does not specifically argue the point, it appears she believes the ALJ erred by rejecting this statement. (*See* Doc. 15 at 6)

Importantly, however, the statement quoted by Plaintiff lacks information that would assist the ALJ in identifying any mental functional limitations for Plaintiff. The Regulations inform claimants: "[m]edical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(1), 416.927(a)(1). The statement identified by Plaintiff indicates only what her symptoms include – depression and anxiety—and the treatment for which Dr. Hirokawa requested authorization. There is no information regarding the severity of her symptoms, her prognosis, or Plaintiff capabilities despite her depression and anxiety. *See Santiago v. Colvin*, 2015 WL 1469290, at *4 (E.D. Cal. Mar. 30, 2015) ("The statement provides a diagnosis, but does not identify specific restrictions or indicate what activities plaintiff can still perform despite his medical condition. As the statement does not constitute an opinion regarding plaintiff's functional limitations, there was simply no opinion to

reject.")

To the extent Plaintiff believes the ALJ ignored this evidence, the ALJ acknowledged that "Dr. Hirokawa reported that the claimant had symptoms of depression and anxiety," and "recommended participation in individual therapy and a referral to a psychiatrist for psychotropic medication." (Doc. 9-3 at 22) The ALJ did not reject this information, but rather evaluated it in conjunction with Plaintiff's "normal mental status examination findings." (*Id.*) The *only* portion of the "Comprehensive Psychological Evaluation" and treatment notes that the ALJ indicated that he rejected was Dr. Hirokawa's conclusion that Plaintiff "was permanently partially disabled." (*Id.* at 22)

Consequently, the Court finds Plaintiff fails to show the ALJ erred in evaluating the statement from Dr. Hirokawa identifying Plaintiff's symptoms and the recommended treatment. *See Santiago,* 2015 WL 1469290, at *4*; Erickson v. Colvin,* 2014 WL 4925256, at *5-6 (E.D. Cal. Sept. 30, 2014) (finding that where the records from a treating physician contained a diagnosis but lacked "any opinion … regarding [the] plaintiff's functional limitations," there was not a "medical opinion" for the ALJ to reject within the meaning of the Regulations).

### b. Opinions on the ultimate issue

A physician's opinion on the ultimate issue of disability is not entitled to controlling weight, because statements "by a medical source that [a claimant] is 'disabled' or 'unable to work'" "are not medical opinions" under the Regulations. 20 C.F.R. §§ 404.1527(e), 416.927(e). Rather, an ALJ "is precluded from giving any special significance to the source; e.g., giving a treating source's opinion controlling weight" when it is on an issue reserved to the Commissioner, such as the ultimate issue of disability. Social Security Ruling (SSR) 96-5p[3], 1996 WL 374183 at *3, (July 2, 1996); *McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2011) ("[t]he law reserves the disability determination to the Commissioner"); *Martinez v. Astrue*, 261 Fed. App'x 33, 35 (9th Cir. 2007) ("the opinion that [a claimant] is unable to work is not a medical opinion, but is an opinion about an issue reserved to the Commissioner. It is therefore not accorded the weight of a medical opinion.").

---

[3] Social Security Rulings are "final opinions and orders and statements of policy and interpretations" issued by the Commissioner. 20 C.F.R. § 402.35(b)(1). While SSRs do not have the force of law, the Ninth Circuit gives the rulings deference "unless they are plainly erroneous or inconsistent with the Act or regulations." *Han v. Bowen*, 882 F.2d 1453, 1457 (9th Cir. 1989); *Avenetti v. Barnhart*, 456 F.3d 1122, 1124 (9th Cir. 2006) ("SSRs reflect the official interpretation of the [SSA] and are entitled to 'some deference' as long as they are consistent with the Social Security Act and regulations").

The ALJ gave "little weight" to the opinion of Dr. Terrell that Plaintiff "was temporarily totally disabled and would not be successful in the competitive job market." (Doc. 9-3 at 22) Likewise, he gave "little weight" to the opinion of Dr. Hirokawa that Plaintiff "was permanently partially disabled." (*Id.*) The ALJ observed that these statements were "opinions on issues reserved to the Commissioner," and as such were "not entitled to any special weight." (*Id.* at 22-23) Because a determination of whether Plaintiff meets the statutory definition of disability is a legal conclusion reserved to the Commissioner, the ALJ did not err in identifying this as a reason to give less weight to the opinions of Drs. Terrell and Hirokawa.

Further, the ALJ indicated he gave the conclusions regarding Plaintiff's disability little weight because they were "inconsistent with the benign mental status examination findings reported by both doctors." (Doc. 9-3 at 23) As the ALJ observed, Dr. Terrell found Plaintiff's "IQ was in the average rage, and she exhibited normal thought content and processes, good long and short-term memory, excellent recall, and good insight and judgment." (*Id.* at 21) The ALJ also noted that Dr. Hirokawa indicated Plaintiff had "normal mental status examination findings," including normal intellectual functioning, intact remote memory, and adequate concentration. (*Id.* at 22) He also observed that Dr. Hirokawa found Plaintiff "had fair mood, fair sleep, fair appetite, affect within normal limits, memory/ concentration within normal limits, cognition within normal limits, and motor activity within normal limits." (*Id.*) These insistencies identified by the ALJ between the examination findings of Drs. Terrell and Dr. Hirokawa and their opinion on the ultimate issue of disability also support the ALJ's decision to give the conclusions little weight. *See Tommasetti v. Astrue,* 533 F.3d 1035, 1041 (9th Cir. 2008) (holding the opinion of a physician may be rejected where an ALJ finds inconsistencies between the doctor's assessment and his own records)*; Khounesavatdy v. Astrue,* 549 F.Supp.2d 1218, 1229 (E.D. Cal. 2008) ("it is established that it is appropriate for an ALJ to consider the absence of supporting findings, and the inconsistency of conclusions with the physician's own findings, in rejecting a physician's opinion").

Because Drs. Terrell and Hirokawa offered opinions on an issue reserved for the Commissioner, and these opinions conflicted with their examination findings as the ALJ observed, the ALJ did not err in rejecting these conclusions related to Plaintiff's disability.

4.    The "Paragraph B" criteria

The Ninth Circuit explained: "The mere existence of an impairment is insufficient proof of a disability." *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993). A medical diagnosis alone "does not demonstrate how that condition impacts plaintiff's ability to engage in basic work activities." *Nottoli v. Astrue*, 2011 U.S. Dist. LEXIS 15850, at *8 (E.D. Cal. Feb. 16, 2011). Thus, Plaintiff must establish not only that she suffered from mental impairments, but also that her impairments were *severe*. *See Bowen*, 482 U.S. 146-47; 20 C.F.R. §§ 404.1520(c).

The "Paragraph B" criteria set forth in 20 C.F.R., Pt. 404, Subpart P, App. 1 are used to evaluate the mental impairments of a claimant, and include: "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." *See id.* The Regulations inform claimants:

> If we rate the degree of your limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities.

20 C.F.R. § 404.1520a(d)(1). The ALJ found Plaintiff's "medically determinable mental impairments cause no more than 'mild' limitation in any of the first three functional areas and 'no' episodes of decompensation." (Doc. 9-3 at 24) As a result, the ALJ concluded Plaintiff's mental impairments "are nonsevere." (*Id.*) Plaintiff challenges the findings of the ALJ related to the first three functional areas.[4] (*See generally* Doc. 14 at 4-9)

a.    *Activities of daily living*

The ALJ found Plaintiff was "capable of performing numerous adaptive activities independently, appropriately, effectively, and on a sustained basis despite her alleged mental impairments." (Doc. 9-3 at 23) The ALJ noted that Plaintiff "lives alone and is capable of performing self-care, preparing simple meals, cleaning the bathroom, carrying for her dog, shopping in stores, watching television and movies, using a computer, and reading." (*Id.*) The ALJ also gave "some consideration… to the claimant's reports of anxiety around large dogs." (*Id.*) He found that although

---

[4] Plaintiff does not challenge the finding of the ALJ related to the fourth functional area, related to episodes of decompensation.

Plaintiff's "activities are somewhat limited, this is largely due to her alleged physical impairments." (*Id.*) Thus, the ALJ concluded Plaintiff had mild limitation in this functional area. (*Id.*)

Plaintiff does not dispute the ALJ's findings regarding the activities that she is able to perform, but disputes their transferability to the workplace. (*See* Doc. 15 at 8-9) Plaintiff contends, "The Ninth Circuit has repeatedly held that many home activities are not easily transferable to what may be the more grueling environment of the workplace." (*Id.* at 9, citing *Vertigan v. Halter,* 260 F.3d 1044, 1049 (9th Cir. 1991); *Garrison v. Colvin,* 759 F.3d 995, 1016 (9th Cir. 2014))

Significantly, in *Vertigan* and *Garrison*, the Ninth Circuit was addressing the ALJ's consideration of the claimants' level of activity and whether they were inconsistent with the claimants' subjective complaints. *See Vertigan*, 260 F.3d at 1049; *Garrison,* 759 F.3d at 1016. In *Vertigan*, the Court observed that it "as repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract *from her credibility* as to her overall disability." *Id.*, 260 F.3d at 1049 (emphasis added). Likewise, in *Garrison* the Court indicated that "ALJs must be especially cautious in concluding that daily activities are *inconsistent with testimony* about pain." *Id.*, 759 F.3d at 1016 (emphasis added). These holdings were grounded in the requirement that when an ALJ uses a claimant's level of activity as part of a credibility determination, the ALJ must find "a claimant engages in numerous daily activities involving skills that could be transferred to the workplace." *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005).

In contrast, at step two, transferability is not relevant to the ALJ's findings. *See Schultz v. Colvin,* 2013 WL 6732879, at *22 n.64 (C.D. Cal. Dec. 19, 2013) (rejecting the plaintiff's contentions that the ALJ erred in not considering transferability at step two); *Lindsay v. Berryhill*, 2018 WL 3487167, at *4 (C.D. Cal. July 18, 2018) (rejecting the same argument presented here—that "many home activities are not easily transferable to what may be the more grueling environment of the workplace"—because "an ALJ is required to consider a claimant's daily activities in analyzing the severity of a mental impairment at step two"). Indeed, the Regulations direct an ALJ to consider what activities a claimant engages in, and the extent he or she can do so independently, appropriately, effectively, and on a sustained basis. *See* 20 C.F.R. Subpart P, App'x 1, Listing 12.00(C)(1). Here, the

ALJ carried this burden.  (*See* Doc. 9-3 at 23)

With similar activities as those identified by the ALJ, courts have determined an ALJ did not err in evaluating the Paragraph B criteria and finding the claimant had mild restrictions with activities of daily living. For example, this Court determined an ALJ did not err in finding a claimant had mild restrictions where the claimant was able to "attend to his personal hygiene," drive, attend church, perform light housekeeping chores, handled his own bills and money. *Ivy v. Comm'r of Soc. Sec.*, 2011 WL 2038579 at *10, 12 (E.D. Cal. May 24, 2011).  Likewise, the Northern District found the ALJ did not err in finding the claimant had no more than mild restrictions where she took care of her personal hygiene and performed chores, such as "light cleaning and cooking without assistance."  *Lewis v. Astrue*, 2012 WL 1067397, at *7 (N.D. Cal. Mar. 28, 2012).  Given the activities identified by the ALJ—and Plaintiff's failure to identify any objective medical evidence disputing the finding that her activities are limited for mental reasons rather than physical—the Court finds the ALJ did not err in finding Plaintiff had only a mild restriction with activities of daily living.

### b.  *Social functioning*

The ALJ determined that Plaintiff had "mild limitation" with social functioning because Plaintiff was "capable of maintaining interaction with individuals in a variety of situations."  (Doc. 9-3 at 24)  In supporting this conclusion, the ALJ observed:

> The claimant alleges she becomes nervous and has anxiety attacks around people (Exhibits 5E, p.1 and 8E, p. 8). However, she testified that she is capable of going to the grocery store and traveling by plane and train.  She socializes with her family (Exhibit 8E, p. 7).  Treating and examining physicians have described her as cooperative and pleasant (Exhibits 11F, p. 104 and 13F, p. 8).  She is able to communicate with various medical providers, regarding her medical conditions.  Finally, at the hearing, the claimant testified on her own behalf, and adhered to proper hearing decorum.

(*Id.*)

Plaintiff contends the ALJ's findings regarding her social functioning "lack[] logic and rationality."  (Doc. 15 at 9)  She suggests the ALJ considered only "that Shirley socialized with her family, is pleasant and cooperative, and can communicate with medical providers, testified on her own behalf and adhered to proper hearing decorum."  (*Id.*)  However, Plaintiff argues:

> The fact that Shirley can socialize with people she knows such as her family does not mean that she can socialize with the general public, coworkers or supervisors.  The fact that Shirley testified on her own behalf; with the help of an attorney does not mean that she can socialize with the general public, coworkers, or supervisors. The fact that

> Shirley can tell her doctors or doctors in general what is going on with her impairments does not mean that she can socialize with general public, coworkers or supervisors.

(*Id.*)  Significantly, Plaintiff ignores the ALJ's findings regarding Plaintiff's ability to go shopping and travel by plane and bus, which clearly involve interactions with the public.

Under the Regulations, claimants are informed that "[s]ocial functioning refers to your capacity to interact … with other individuals." 20 C.F.R. Subpart P, App'x 1, Listing 12.00(C)(2).  Further, the Regulations explain:  "Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers.  You may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation."  *Id.*  On the other hand, "strength in social functioning" may be exhibited with a claimant's "ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities."  *Id.*  The Regulations indicate an ALJ will "also need to consider cooperative behaviors, consideration for others, awareness of others' feelings, and social maturity."  *Id.* Explaining these factors, the Regulations note that "[s]ocial functioning in work situations may involve interactions with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers."  (*Id.*)

To the extent Plaintiff contends the ALJ erred in assessing the evidence—which showed Plaintiff's ability to socialize with her family; cooperative behavior identified by physicians; communication abilities, including with medical providers and at the hearing; and adherence to proper hearing decorum— these are clearly proper considerations under the Regulations.  Plaintiff's reported nervousness and anxiety attacks around people relate to an "impaired social functioning."  *See* 20 C.F.R. Subpart P, App'x 1, Listing 12.00(C)(2).  However, the ability to travel and maintain interpersonal relationships are strengths in social functioning.  Likewise, her ability to communicate with physicians is considered a strength.  *See id.*

Further, as the ALJ observed, Drs. Terrell and Hirokawa each indicated Plaintiff exhibited cooperative behavior, which is also identified as a strength in social functioning under the Regulations. Specifically, Dr. Terrell observed that Plaintiff had good eye contact, and "was friendly and cooperative

throughout the interview." (Doc. 9-19 at 34) Dr. Hirokawa observed that Plaintiff had a fair mood and pleasant attitude, and her "behavior was cooperative throughout the evaluation." (Doc. 9-22 at 55) These objective observations support the ALJ's conclusions related to Plaintiff's social functioning.

Finally, Plaintiff seems to suggest that the ALJ erred in considering her ability to testify at the hearing, and her observance of "proper hearing decorum." However, as noted above, the ability to "communicate clearly with others" is a factor under the social functioning domain. 20 C.F.R. Subpart P, App'x 1, Listing 12.00(C)(2). Adherence to hearing decorum relates to consideration for others and social maturity, which are also factors for this domain. Consequently, the Court finds the ALJ did not err in considering these factors.

Plaintiff does not identify any objective evidence to dispute the ALJ's findings that she "is capable of maintaining interaction with individuals in a variety of situations." (*See* Doc. 9-3 at 33) Instead she merely disagrees with the ALJ's interpretation of the evidence, which is insufficient to demonstrate error by the ALJ. *See Ryan v. Comm'r of Soc. Sec.,* 528 F.3d 1194, 1198 (9th Cir. 2008) ("[w]here evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld"); *Raisor v. Comm'r of Soc. Sec.*, 2017 WL 4270052, at *3 (E.D. Cal. Sept. 2, 2017) ("this court may not disturb the decision based on plaintiff's proffered alternative interpretation of the evidence"). Thus, the Court finds Plaintiff fails to show any legal error with the ALJ's conclusion that she suffers from only mild difficulties with social functioning.

### c. *Concentration, persistence, or pace*

In reviewing the third functional area of the Paragraph B criteria, the ALJ observed that Plaintiff "alleged her conditions affect her ability to concentrate." (Doc. 9-3 at 23) However, the ALJ found "treatment notes report the claimant's ability to concentrat[e] was adequate, or within normal limits." (*Id.*) In addition, the ALJ noted Plaintiff "admitted she is able to pay attention for about two hours and is capable of following written instructions." (*Id.*) The ALJ also indicated that he gave "some consideration the claimant's subjective complaint that she requires spoken instructions to be repeated several times." (*Id.* at 24) The ALJ concluded Plaintiff has a "mild limitation" with this functional area because she "has the ability to sustain focused attention and concentration sufficiently long enough to permit the timely and appropriate completion of tasks commonly found in work settings despite her

alleged mental impairments." (*Id.* at 23, 24)

Challenging the findings of the ALJ related to the third functional area of concentration, persistence, and pace, Plaintiff argues:

> [T]he ALJ pointed to the fact that she admitted that she can pay attention for two hours and capable of following written instructions. AR 22. Those identified capabilities are often times assessed as limitations in concertation (sic), persistence, and pace. The ALJ is required to review the record as a whole. *See Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir.1984).

(Doc. 15 at 10) Specifically, Plaintiff cites *Gallant* for the holding that it is an "error for an ALJ to ignore or misstate the competent evidence in the record in order to justify his conclusion." (*Id.*)

Importantly, however, Plaintiff fails to identify any evidence in the record that she believes the ALJ failed to consider related to her concentration, persistence, and pace. In addition, Plaintiff does not cite any cases to support her contention that the ability to concentrate for two hours and follow written instructions "often times assessed as limitations." Nevertheless, the Court notes that the ALJ *did* find Plaintiff had limitations with concentration, persistence, and pace—but only mild—after reviewing the evidence identified by Plaintiff in her opening brief. (*See* Doc. 9-3 at 23, 24)

Moreover, as the ALJ observed, Dr. Hirokawa repeatedly determined that Plaintiff's "ability to concentrat[e] was adequate, or within normal limits." (Doc. 9-3 at 23) The ALJ noted that in June 2013, Dr. Hirokawa found Plaintiff had "memory/concentration within normal limits, cognition within normal limits, and motor activity within normal limits." (*Id.* at 22, citing Exh. 14F, p. 6 [Doc. 9-23 at 6]) The objective findings of Dr. Hirokawa support the ALJ's decision regarding the third functional area. The ALJ's analysis is also supported by the findings of Dr. Terrell that Plaintiff's "intellectual functioning appeared to be within normal limits, her remote memory appeared intact, and she exhibited adequate concentration." (*Id.* at 22; *see also* Doc. 9-22 at 55 [Plaintiff's "[r]emote memory appeared intact" and her ""[c]oncentration for conversation was adequate"])

Because Plaintiff fails to identify any evidence she believes the ALJ failed to consider in the record, and she fails to identify any objective evidence that conflicts with the ALJ's findings, the Court finds Plaintiff fails to show she suffers from more than mild limitations with concentration, persistence, or pace.

///

As Defendant contends, the step two findings of the ALJ are supported by substantial evidence in the record. (*See* Doc. 16 at 11, 14-23) The term "substantial evidence" "describes a quality of evidence ... intended to indicate that the evidence that is inconsistent with the opinion need not prove by a preponderance that the opinion is wrong." SSR 96-2p, 1996 SSR LEXIS 9 at *8[5]. "It need only be such relevant evidence as a reasonable mind would accept as adequate to support a conclusion that is contrary to the conclusion expressed in the medical opinion." *Id.*

The ALJ's conclusions regarding the Paragraph B criteria are supported by the clinical findings of Drs. Terrell and Hirokawa, as well as the "narrative interpretations" of Drs. Funkenstein and Schumacher. (*See* Doc. 9-3 at 23) As the ALJ observed, Drs. Funkenstein and Schumacher opined that Plaintiff did not have severe mental impairments. (Doc. 10-4 at 10, 39) Dr. Funkenstein found Plaintiff's record "from [the] worker's comp case and some treatment as an adult [were] consistent with mild limitations." (Doc. 9-4 at 11) Likewise, Dr. Shumacher reviewed the record after Plaintiff reported "worsening of depression and anxiety," and found it the records did not support her report because her "mental status findings were normal" at the April 2013 examination with Dr. Hirokawa, and she continued to have "grossly normal" mental status through September 2013. (*Id.* at 58-59) Both Drs. Funkenstein and Schumacher opined that Plaintiff had mild limitations with activities of daily living; mild difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace. (*Id.* at 10, 59) Because the physicians concluded the limitations in these three functional limitations were "mild," they concluded Plaintiff's impairment were "non-severe." (*See id.* at 11, 58; 20 C.F.R. § 404.1520a(d)(1)) These conclusions were consistent with the normal examination findings. Consequently, the opinions of Drs. Funkenstein and Schumacher are substantial evidence supporting the ALJ's step two determination. *See Andrews v. Shalala*, 53 F.3d 1035, 1042 (9th Cir. 1995) (opinions of non-examining physicians "may serve as substantial evidence

---

[5] Social Security Rulings (SSR) are "final opinions and orders and statements of policy and interpretations" issued by the Commissioner. 20 C.F.R. § 402.35(b)(1). Although they do not have the force of law, the Ninth Circuit gives the Rulings deference "unless they are plainly erroneous or inconsistent with the Act or regulations." *Han v. Bowen*, 882 F.2d 1453, 1457 (9th Cir. 1989); *see also Avenetti v. Barnhart*, 456 F.3d 1122, 1124 (9th Cir. 2006) ("SSRs reflect the official interpretation of the [SSA] and are entitled to 'some deference' as long as they are consistent with the Social Security Act and regulations").

when they are supported by other evidence in the record and are consistent with it"); *Tonapetyan*, 242 F.3d 1149 (the opinions of non-examining physicians "may constitute substantial evidence when … consistent with other independent evidence in the record").

Moreover, though the ALJ gave little weight to the GAF scores identified by Drs. Terrell and Hirokawa—because "[g]enerally, GAF scores are not used to evaluate disability in Social Security cases" (Doc. 9-3 at 21, n.1) — the Court notes the GAF scores further support the ALJ's findings.[6] Dr. Terrell gave Plaintiff a GAF score of 61 after his examination in August 2012 (Doc. 9-19 at 36), and Dr. Hirokawa gave Plaintiff a GAF score of 65 in August 2013. (Doc. 9-23 at 4)  Both of these scores indicate the physicians' belief that Plaintiff had "[s]ome *mild* symptoms … but [was] generally functioning pretty well." *See DSM-IV* at 34 (emphasis added).  Thus, the GAF scores are support the ALJ's step two findings that Plaintiff had mild limitations with the first three functional domains.

Finally, the ALJ's adverse credibility finding—which Plaintiff did not challenge— supports the finding that her mental impairments are not severe. *See Lomas v. Colvin*, 2014 WL 6775762, at *4-5 (C.D. Cal. Dec. 2, 2014) (holding "[t]he ALJ's adverse credibility finding … further supports the mental nonseverity finding").

## CONCLUSION AND ORDER

For the reasons set forth above, the Court finds the ALJ did not err in evaluating the evidence related to Plaintiff's mental impairments, and substantial evidence in the record supports the ALJ's findings at step two.  Thus, the Court must uphold the ALJ's conclusion that Plaintiff is not disabled as defined by the Social Security Act. *See Sanchez*, 812 F.2d at 510.

///

---

[6] Plaintiff does not address the ALJ's decision to give little weight to the GAF scores, and any challenge has been waived. *See Bray*, 554 F.3d at 1226 n.7; Zango, 568 F.3d at 1177 n.8.

Notably, the Ninth Circuit determined that "it was not error for the ALJ to disregard [the claimant's] GAF score" because it "does not have a direct correlation to the severity requirements in the Social Security Administration's mental disorders listings. *Doney v. Astrue*, 485 Fed. App'x. 163, 165 (9th Cir. 2012).  This court and others have determined that GAF scores are, in fact, "snapshots" of a claimant's abilities at that time.  *See, e.g., Margulis v. Colvin*, 2015 WL 1021117, at *16 (E.D. Cal. Mar. 6, 2015) ("GAF scores are unreliable indicators of a claimant's ability to perform sustained work, as they are 'merely a snapshot in time' that may or may not be supported by the overall medical record"); *Parker v. Astrue*, 664 F.Supp.2d 544, 557 (D.S.C. 2009) (stating that "Plaintiff's GAF score is only a snapshot in time, and not indicative of Plaintiff's long term level of functioning").  Nevertheless, GAF scores may be used "as evidence of mental functioning for a disability analysis." *Craig v. Colvin*, 659 Fed. App'x 381, 382 (9th Cir. 2016), citing SSA Administrative Message 13066 (effective July 22, 2013).

Based upon the foregoing, the Court **ORDERS**:

1.     The decision of the Commissioner of Social Security is **AFFIRMED**; and

2.     The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendant Nancy A. Berryhill, Acting Commissioner of Social Security, and against Lackisha Lashe Marie Shirley.

IT IS SO ORDERED.

Dated:   **September 27, 2018**        **/s/ Jennifer L. Thurston**
UNITED STATES MAGISTRATE JUDGE